IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ST.  JULIAN LADSON | } | |
| | } | |
| Plaintiff | } | |
| | } | |
| v. | } | CIVIL ACTION NO. H-05-1643 |
| | } | |
| UNITED STATES POSTAL SERVICE, and | } | |
| JOHN E.  POTTER, Post Master General | } | |
| | } | |
| Defendant | } | |

**MEMORANDUM OPINION & ORDER**

Plaintiff brings this discrimination suit under Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e *et seq.* and under Section 501 of the Rehabilitation Act of 1973 ("Rehabilitation Act"), as amended, 29 U.S.C. § 791 *et seq.*  Pending before the court is Defendant's motion for summary judgment on all of Plaintiff's claims and its memorandum in support (Doc. 15).  Plaintiff has filed a response (Doc. 18). For the reasons explained below, the court ORDERS that Defendant's motion is GRANTED.

I.          Background and Relevant Facts

Plaintiff St. Julian Ladson ("Ladson") started working for the Defendant, United States Postal Service ("Postal Service"), in August 1976.  EEOC Hr'g Tr. ("Tr.") 21:9-11 (Doc. 15 Ex.  E).  Over the years he was promoted to "T-6 finance clerk," and his duties included acting as the clerk-in-charge; being the backup for main stamp stock; providing window relief; maintaining accurate financial and box rental records; requesting and issuing stamp stock; ordering supplies; consolidating and checking the daily station receipts; closing the station; performing mail dispatch duties; setting the meter; acting as the lobby director; and generally performing any other duties

-1-

assigned by his supervisor, including "boxing the mail," i.e., sorting and placing mail in customers' wall mail boxes.  *See* EEO Investigation Report ("Report") USPS 54 (Doc. 15 Ex. D).  In 1998, Ladson was hired as a T-6 finance clerk at the Civic Center Post Office, located in the Federal Court House at 515 Rusk St., in Houston, Texas.  *See* Tr. 36:3-8 (Doc. 15 Ex. E).  Ladson's supervisor at the Civic Center was Alvin Mays ("Mays").  *Id*. at 119:20-22.

Ladson suffers from cardiomyopathy, a condition which causes heart failure symptoms, low energy levels, and fatigue when standing or walking.  *Id*. at 18:5-11.  He also suffers from "degenerating knees."  *Id*.  In July 2000, Ladson was medically restricted from standing longer than 5 to 10 minutes at a time and from walking more than 10 to 25 feet without resting.  *Id*.  at 18:12 – 19:3; *see also* Doctor Letters (Doc. 18 Ex. A).[1]  As such, Ladson began using a stool when performing duties that typically required standing.  One of these duties included  manning the window units to attend to postal customers.  At least 2 to 3 hours[2] of Ladson's eight-hour workday involved window unit relief, whereby Ladson filled in for the window clerks as they took lunch and other breaks.  *See* Tr.  78 - 79 (Doc. 15 Ex. E).  Ladson also reassigned window clerks to other tasks requiring standing, like box mail, in order to take over the window.  *See id*. at 104-07.  Co-workers often helped Ladson with his official duties.  *See, e.g.*, *id*. at 258:12 - 259:3 (going to the bank to get change) and at 259:23 - 261:9 (fetching and retrieving packages for his customers at the window).[3]

---

[1] Ladson testified that he had a lifting restriction of five or ten pounds. *Id.* at  88:19-24.  Nevertheless, this fact appears to be disputed.  *See* Pl.'s Resp.  3 (Doc.  18) (parenthetically claiming that "[c]ontrary to Defendant's characterization of the facts, there is no restriction on lifting more than 10 pounds").

[2] This is most likely a conservative estimate.  Ladson's own testimony reveals that the typical workday found him at the window "*[m]ostly* seven to six hours, and *sometimes* less" when the Civic Center had a full crew. Tr. 36:18-20 (Doc. 15 Ex. E) (emphasis added).

[3] Ladson's position is that co-workers always volunteered to help him, but he does not dispute that help was needed.  *See id.* at 72:11.

By late 2000, the Postal Service decided to discontinue the use of stools (as well as restbars) at the window units at the Civic Center Post Office.  Mays received verbal instructions to stop the practice,  *id*. at 180:23 – 181:8, but did allow Ladson to use a stool briefly until the end of the year.  On February 27, 2001, the Postal Service sent a memorandum to Mays outlining its policy on the use of stools at window units at the Civic Center.  The memo listed the following safety hazards allegedly presented by the practice:

– Limited Space, which could cause tripping hazards.
– Twisting and turning at the waist to reach supplies causes strain to the back and shoulders.
– Possible loss of balance while seated due to repeated twisting and turning.
– Increased stress on shoulders and back due to reaching across the counter.
– Increased strain from lifting parcels from a seated position.
– Poor customer image.

Safety Memo (Doc.18 Ex. E).  Thereafter, no Civil Center postal employee was permitted to use a stool while working at the window units.

In January 2001, before issuing the safety memo, the Postal Service relocated Ladson to another post office facility, the Julius Melcher Station, where he primarily handled return-to-sender mail and helped with the training of light-duty clerks.  Tr. 32:3 – 33:2 (Doc. 15 Ex. E).  These tasks allowed him to remain sedentary throughout the day.  After eleven months, Ladson was sent to the Greenbriar Station to perform essentially the same duties.  *Id*. at 33:4-25.  Ladson spent 4-5 months at the Greenbriar Station until he was transferred again, this time to the River Oaks Station, where he continued processing return-to-sender mail in addition to magazines for several more months.  *Id*. at 34:12-25.

On July 15, 2002, Ladson reported to the River Oaks facility as usual, but was told

to report back to his original assignment at the Civic Center.  Ladson's return to the Civic Center was unexpected, and Mays informed Plaintiff that there was no "light duty" work available because a stool could not be used at the window.  *See id*. at 41- 43.  Ladson was disappointed in the news and became even more upset when Mays refused to let him use the phone to call the Union.  *See id*. at 96:18 - 98:2.  Mays subsequently asked Ladson to leave the building.  *Id*. at 171-172.

On July 18, 2002, Ladson submitted a request for light-duty work at the Civic Center facility only.  Report USPS 20 (Doc. 15 Ex.  D).  On July 31st, Mays forwarded to the District Reasonable Accommodation Committee ("DRAC") a Nomination for Reasonable Accommodation Consideration form and worksheet, indicating that the Civic Center could not reasonably accommodate Ladson because standing was an essential part of his position and the Center could not allow the use of a stool.  *Id*. at USPS 21-27.

After security increased at federal facilities in the wake of September 11th, the Federal Court House at 515 Rusk in Houston permanently locked the Smith Street entrance, which had previously provided easy access to the Civic Center.  *See* Tr. 157 (Doc. 15 Ex.  E).  The Civic Center facility lost significant revenue because many customers did not want to deal with the inconvenience of going through the mandatory security screening at the front entrance of the Court House in order to access the post office.  *Id*.  In 2002, a "Function 4" auditing team conducted a Houston-area assessment of the post offices to determine where jobs should be cut.  *Id*. at 155:24 –156:14.  The team assessed the Civic Center in conjunction with another local post office, the Sam Houston facility, and determined that the Civic Center needed only four full-time regular employees, with one employee from Sam Houston working at the unit for two hours.  Report USPS 57 (Doc. 15 Ex.  D).  After consulting with Mays and his supervisor, the Function 4 team further determined

-4-

that a full-time T6 finance clerk was not necessary at the Civic Center location.  Tr.  157-58 (Doc. 15 Ex. E).  On July 17, 2002, Ladson received a letter from Pat Syal, the human resources manager for the Postal Service Houston district, advising Ladson that his duty assignment was abolished and that he would "become excess to the needs of [his] section effective September 7, 2002."  Report USPS 52 (Doc. 15 Ex. D).  The letter "encouraged" Ladson "to bid on vacant duty assignments posted for bid."  *Id.*  Ladson did not bid on another assignment and did not come back to work for the Postal Service after the day Mays asked him to leave the Civic Center.

On September 29, 2002, Ladson filed an equal employment opportunity ("EEO") complaint against the Postal Service alleging gender, race, and disability discrimination.  *Id.* at USPS 73.  Ladson claimed that the Postal Service discriminated against him on the basis of gender by allowing "[t]wo female clerks . . . to use a stool at the window unit because of medical reasons to perform [their] job" and not allowing him to do so.  *Id.*   In his assertion of race (African American) discrimination, Ladson claims that another T6 finance clerk (Hispanic) at the Sam Houston facility did not have his bid abolished despite having less seniority than Ladson.  Tr.  44:16 - 45:7, 160:10 - 162:3 (Doc. 15 Ex.  E).  Ladson's primary claim, however, was that the Postal Service unlawfully discriminated against him on the basis of his disability (cardiomyopathy) when (1) on July 15, 2002, Mays sent him home because there was no "light duty" work available, and when (2) on July 17, 2002, Ladson received a letter abolishing his T6 bid position.  Report USPS 1 (Doc. 15 Ex.  D).  Thereafter, Ladson applied for and received full disability and retirement benefits.  Ladson Dep.  Excerpt (Doc.  15 Ex.  F).  He receives approximately $4000 monthly in benefits from Social Security, the Postal Service, and the Veteran's Administration.[4]  *Id.*  He is rated

---

[4] Ladson served a tour of duty in the Vietnam War and was honorably discharged in 1966.

100% disabled because of his cardiomyopathy illness.  *Id.*

On September 3, 2003, an EEOC hearing was held in Houston before the Honorable Claudine R. James, Administrative Judge.  Hr'g Tr. (Doc. 15 Ex. E).  On August 31, 2004, Judge James issued her opinion that (1) Ladson had failed to establish a *prima facie* case of sex discrimination because he could not identify female counterparts that were similarly situated and treated more favorably; and alternatively that the Postal Service had articulated a nondiscriminatory reason for its actions in abolishing his position; (2) that Ladson may have established a *prima facie* case of race discrimination, but he had failed to rebut the Postal Service's nondiscriminatory reason for its actions; and (3) that Ladson failed to establish a *prima facie* case of disability discrimination because (i) he could not perform the essential functions of his position without endangering himself or others because the use of the stool was a safety hazard, and (ii) because Mays attempted to reasonably accommodate Ladson by attempting to locate appropriate "light-duty" work in other facilities.  *See* AJ Decision (Doc. 15 Ex. A).  The Postal Service issued a Notice of Final Action on September 17, 2004, agreeing with and implementing the decision by Judge James.  (Doc. 15 Ex. B).  On February 2, 2005, the EEOC affirmed the agency's final order.  EEOC Decision (Doc. 15 Ex. C).  The EEOC disagreed with the Administrative Judge's conclusion that Ladson could not perform his job without endangering the safety of himself and others, but upheld the decision on the basis that Ladson was not qualified to perform other essential parts of his job with or without a stool. *Id.* at 4.  On May 6, 2005, Ladson filed suit in this court alleging identical claims of gender, race, and disability discrimination.  Pl.'s Compl.  (Doc. 1).

II.      Legal Standards

         A.      Summary Judgment

-6-

A party moving for summary judgment must inform the court of the motion's basis and identify those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, that show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Hart v. Hairston*, 343 F.3d 762, 764 (5th Cir. 2003). The substantive law governing the suit identifies the essential elements of the claims at issue and therefore indicates which facts are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The initial burden falls on the movant to identify areas essential to the nonmovant's claim in which there is an "absence of a genuine issue of material fact." *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005).

Once the movant makes this showing, the nonmovant must direct the court's attention to evidence in the record sufficient to establish that there is a genuine issue of material fact for trial. *Celotex*, 477 U.S. at 323-24. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Indust. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), *citing U.S. v. Diebold, Inc.,* 369 U.S. 654, 655 (1962). Instead, the non-moving party must produce evidence upon which a jury could reasonably base a verdict in its favor. *Anderson*, 477 U.S. at 248; *see also DIRECTV Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2006). The non-movant must "go beyond the pleadings and by [its] own affidavits or by depositions, answers to interrogatories and admissions on file, designate specific facts that show there is a genuine issue for trial." *Webb v. Cardiothoracic Surgery Assoc. of North Texas, P.A.*, 139 F.3d 532, 536 (5th Cir. 1998). Unsubstantiated and subjective beliefs and conclusory allegations and opinions of fact are not competent summary judgment evidence. *Morris*

-7-

*v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998); *Grimes v. Texas Dept. of Mental Health and Mental Retardation*, 102 F.3d 137, 139-40 (5th Cir. 1996); *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994), *cert. denied*, 513 U.S. 871 (1994); *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir. 1992), *cert. denied*, 506 U.S. 825 (1992).

Nevertheless, all reasonable inferences must be drawn in favor of the non-moving party.  *Matsushita*, 475 U.S. at 587-88; *see also Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.*, 336 F.3d 410, 412 (5th Cir. 2003).   Furthermore, the party opposing a motion for summary judgment does not need to present additional evidence, but may identify genuine issues of fact extant in the summary judgment evidence produced by the moving party.  *Isquith v. Middle South Utilities, Inc.*, 847 F.2d 186, 198-200 (5th Cir. 1988).  The non-moving party may also identify evidentiary documents already in the record that establish specific facts showing the existence of a genuine issue.  *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 178 (5th Cir. 1990).  In reviewing evidence favorable to the party opposing a motion for summary judgment, a court should be more lenient in allowing evidence that is admissible, though it may not be in admissible form.  *See Lodge Hall Music, Inc. v. Waco Wrangler Club, Inc.,* 831 F.2d 77, 80 (5th Cir. 1988).

B.      Evidentiary Framework for Employment Discrimination under Title VII

This is a case of discrimination based solely on circumstantial evidence.  As such, Ladson's claims are governed by the tripartite burden-shifting scheme established in *McDonnell Douglas v. Green*, 411 U.S. 792, 802-04 (1973).  Under the *McDonnell Douglas* test, if Ladson establishes a *prima facie* case of discrimination, a presumption of discrimination arises, and the burden shifts to the Postal Service to articulate a legitimate, non-discriminatory reason for its employment action.  *Price v. Federal Express Corp.*, 283 F.3d 715, 720 (5th Cir. 2002).  The Postal

-8-

Service's burden is satisfied if it produces evidence, which "*taken as true*, would *permit* the conclusion that there was a nondiscriminatory reason for the adverse action." *Id*. (*citing St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509 (1993)) (emphasis in original).  If the defendant satisfies this burden and articulates a reason that can support a finding that its actions were nondiscriminatory, then "the mandatory inference of discrimination created by the plaintiff's *prima facie* case drops out." *Id*. (citing *Hicks*, 509 U.S. at 510-511).   Plaintiff must then introduce evidence creating a jury question as to whether the defendant was motivated by discriminatory animus.  Plaintiff meets this burden by showing either (1) that defendant's articulated reason was pretextual (pretext alternative), or (2) that plaintiff's protected characteristic was a motivating factor in the decision (mixed motives alternative). *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004).[5]  In determining whether summary judgment is appropriate, courts should consider "the strength of the plaintiff's *prima facie* case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered."  *Reeves v.  Sanderson Plumbing Prods.*, 530 U.S. 133, 148-49 (2000).

C.     <em>Prima facie</em> Case for Race and Gender Discrimination under Title VII

---

[5]  *McDonnell Douglas* was slightly modified in certain contexts by *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 92 (2003), which held that circumstantial evidence can be considered in deciding  "whether an employment decision is made 'because of' [a protected classification] in a 'mixed-motive' case, i.e., where both legitimate and illegitimate reasons motivated the decision."  Although the Supreme Court did not expressly reference *McDonnell Douglas* in its opinion, the Fifth Circuit Court of Appeals has held that the "modified  *McDonnell Douglas*" approach applies when analyzing "mixed-motive" circumstantial evidence.  *Keelan v. Majesco Software, Inc.*, 407 F.3d 332, 340 (5th Cir. 2005).
    The court further notes that the "mixed motive" analysis may not apply to Ladson's claim of disability discrimination brought under the Rehabilitation Act.  To prevail under the Rehabilitation Act, a plaintiff must prove that he was discriminated "*solely* by reason of" the disability.  29 U.S.C. § 794(a) (emphasis added). This language suggests that additional factors motivating the employment action, or "mixed motives," are irrelevant.  *See Soledad v. United States Dep't of Treasury*, 304 F.3d 500, 504-05 (5th Cir.  2002).  The court need not ultimately resolve this issue because Ladson has not argued "mixed motives" in his Rehabilitation Act claim, and *Desert Palace* and the "modified *McDonnell Douglas*" approach do not alter the court's analysis in a pure pretext case.  *See Keelan*, 407 F.3d at 340 (citing *Raytheon Co. v. Hernandez*, 540 U.S. 44, 49 (2003)).  The legal standards for a *prima facie* case under the Rehabilitation Act are discussed in Part II.D  *infra*.

A *prima facie* case of race and gender discrimination under Title VII is evidence that plaintiff (1) is a member of a protected class; (2) was qualified for his position; (3) was discharged or suffered some other adverse employment action; and (4) was replaced with a person outside of the protected class, or others similarly situated were treated more favorably. *See Okoye v. Univ. of Tex. Houston Health Sci. Ctr.*, 245 F.3d 507, 512-13 (5th Cir. 2001).

D.     *Prima facie* Case for Discrimination under the Rehabilitation Act

The *McDonnell Douglas* burden-shifting analysis specifically applies to claims brought under the Rehabilitation Act. *See Handy v. Brownlee*, 118 F. App'x 850, 854 & n.3 (5th Cir. 2004) (stating that although the Fifth Circuit has not applied the *McDonnell Douglas* framework in a published opinion, every other circuit except the First and Eleventh has, and the Fifth would in an appropriate case); *Ryburn v. Potter*, 155 F. App'x 102, 111 (5th Cir. 2005) (applying the burden shifting framework in a Rehabilitation Act case).  In addition, the Rehabilitation Act provides that the "standards used to determine whether this section has been violated . . . shall be the standards applied under . . . [the] Americans with Disabilities Act of 1990."[6] 29 U.S.C. § 794(d).

Under the Rehabilitation Act, to establish discrimination based on disability, plaintiff must demonstrate that: (1) he is an "individual with a disability;" (2) he was "otherwise qualified" for the job in question; (3) he worked for a federal agency or a "program or activity receiving Federal financial assistance;" and (4) he was denied the benefits of his employment or was discriminated against "solely by reason of her or his disability." *Hileman v. City of Dallas*, 115 F.3d 352, 353 (5th Cir. 1997) (quoting 29 U.S.C. § 794(a)); *see also Calderon v. Potter*, 113 Fed.Appx.

_____

[6] 42 U.S.C. §§ 12101 *et seq.*  (hereafter "ADA")

586, 590-591 (5th Cir. 2004).  An "individual with a disability" is any person who (1) has a physical or mental impairment that "substantially limits one or more of such person's major life activities;" (2) has a record of such impairment; or (3) is regarded as having such impairment."  *Hileman*, 115 F.3d at 353 (quoting 29 U.S.C. § 706(8)(B)).  Major life activities are "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 45 C.F.R. 84.3(2)(ii).

III.      <u>Analysis</u>

    (1)      Gender and Race Discrimination Claims

       The Postal Service offers the following arguments: (1) that Ladson's gender discrimination claim fails because there is no evidence that similarly situated female employees were treated more favorably; and (2) that Ladson's race discrimination claim fails because he has not rebutted the Postal Service's offer of a legitimate, non-discriminatory reason for its actions.  *See* Def.'s Mot.  Summ.  J.  11, 15 (Doc.  15).  Ladson does not address either of the Postal Service's arguments.  Indeed, Plaintiff appears to have abandoned his gender and race discrimination claims altogether.  The court will therefore accept as undisputed the facts set forth in support of the Postal Service's motion on these two claims.  *See Eversley v.  Mbank Dallas*, 843 F.2d 172, 174 (5th Cir. 1988).

       Reviewing the record, the court finds no evidence that female employees received special treatment or that the Postal Service's decision to terminate Ladson's position was pretextual. It is undisputed that once the stools were removed no one was allowed to sit down while working the window units.  Thus, there is no evidence that female employees "were treated differently under circumstances 'nearly identical'" to Ladson's. *See Mayberry v.  Vought Aircraft Co.*, 55 F.3d 1086,

1090 (5th Cir. 1995). Indeed, everyone was treated the same. In conjunction with his race discrimination claim, Ladson has failed to rebut the Postal Service's evidence that the decision to abolish the Civic Center T6 finance clerk position was based on legitimate economic and business reasons and not motivated by discriminatory animus.[7] Plaintiff's subjective beliefs to the contrary are not competent summary judgment evidence. No genuine issues of material fact exist on his gender and race discrimination claims, and summary judgment in favor of the Postal Service is therefore appropriate.

(2)     Disability Discrimination Claim

The core of this dispute turns on whether Ladson was "otherwise qualified" for the T6 finance clerk position. Under the ADA, whose standards apply to the Rehabilitation Act, a "qualified individual with a disability" means "an individual with a disability who satisfies the requisite skill, experience, education and other job-related requirements of the employment position such individual holds or desires, and who, with or without reasonable accommodation, can perform the essential functions of such position." 29 C.F.R. 1630.2(m). Therefore, to determine whether an employee is "otherwise qualified," the court must conduct a two-step inquiry: first, whether an employee can perform the core, or essential, functions of the job; and, second, if the employee is unable to perform the core functions, whether reasonable accommodations would enable the employee to do so. *Chandler v. City of Dallas*, 2 F.3d 1385, 1393-94 (5th Cir. 1993); *see also Handy*, 118 Fed. Appx. at 854. Plaintiff bears the burden of demonstrating that he is "otherwise qualified." *Chandler*, 2 F.3d at 1394.

_____

[7] The court assumes, without deciding, that Plaintiff has established a *prima facie* case of racial discrimination.

The court must first identify what constituted the "essential functions" of Ladson's position.  "Essential functions" are those duties that are fundamental to the job at issue.  *Kapche v. City of San Antonio*, 176 F.3d 840, 843 (5th Cir. 1999) (citing 29 C.F.R. § 1630.2(n)(1)).  According to the EEOC's implementing regulations, a job function may be considered essential if, for example, (1) the purpose of the position is the performance of that function, (2) only a limited number of employees are available among whom the performance of that function can be delegated, or (3) an employee is hired because of his expertise or ability to perform a specialized function. To aid in the determination of whether a function is essential, a court may consider as evidence a variety of factors including, but not limited to, (1) the employer's judgment as to which functions are essential, (2) written job descriptions prepared before advertising or interviewing applicants for the job, (3) the amount of time spent on the job performing the function, and (4) the work experience of both past and current employees in the job.  *Id.*  (citing 20 C.F.R. § 1630.2(n)(3)(i)-(vii)).  In this case, the essential functions of Ladson's position were all the duties listed in the job description as well as boxing the mail, which fell into the "performing any other duties assigned by his supervisor" category.

The next inquiry is whether Ladson could perform the essential functions of his job with or without any accommodations.  It is undisputed that Ladson's medical restrictions, without accommodation, prevented him from performing several key duties, including window relief, dispatch, boxing the mail, transporting customer parcels to the bin, and going to get change from the bank.  Thus, the critical question is whether a reasonable accommodation existed to allow Ladson to perform these essential functions without endangering the health or safety of himself and others.  Ladson relies primarily on his claim that a stool would have been a reasonable

accommodation for his window relief duties, but overlooks the fact that window relief was only one of several essential duties that could not be performed absent an accommodation.  These duties include dispatch and boxing the mail, both of which require standing, lifting, and generally moving around.  Plaintiff did not request an alternative accommodation, and a  reallocation of the essential functions of an employee's position to other employees is not a "reasonable accommodation" under the Rehabilitation Act.  *See, e.g., Newman v. Chevron U.S.A.*, 979 F. Supp. 1085, 1091 (S.D. Tex. 1997) (holding that assigning two people to do one person's job is unreasonable); *Hershey v. Praxair, Inc.*, 969 F. Supp. 429, 435 (S.D. Tex. 1997) ("it is not a reasonable accommodation to assign a Technician Helper to assist Plaintiff in the performance of the essential functions of his job. . . . It is not reasonable to require an employer to have two people doing one person's job in the name of accommodation.").[8]  Moreover, the Postal Service was not required to place Ladson at a specific facility that would have allowed him to be exempt from several of his essential functions.  *See Fuentes v.  United States Postal Service*, 989 F. Supp. 67, 72-74 (D.P.R. 1997), *aff'd*, 132 F.3d 30 (1st Cir.  1997).  In his request for reasonable accommodation, Ladson expressed a desire to work only at the Civic Center.  Report USPS 20 (Doc. 15 Ex.  D).  For these reasons, the court concludes that Ladson was not a "qualified" individual with a disability.  Ladson has failed therefore to prove

---

[8]  *See also Gilbert v. Frank*, 949 F.2d 637, 642 (2d Cir. 1991) ('"reasonable  accommodation" does not mean elimination of any of the job's essential functions"); *Soto-Ocasio v. Federal Express Corp.*, 150 F.3d 14, 20 (1st Cir. 1998) (holding that requiring employer to allocate other employees to complete plaintiff's work is unreasonable); *Johnson v. Georgia Dep't of Human Resources*, 983 F. Supp. 1464, 1474 (N.D. Ga. 1996) ("An employer . . . is not required to reallocate essential job functions. . . . For example, suppose a security guard position requires the individual who holds the job to inspect identification cards. An employer would not have to provide an individual who is legally blind with an assistant to look at the identification cards for the legally blind employee."); *Dey v. Milwaukee Forge*, 957 F. Supp. 1043, 1052 (E.D. Wis. 1996) (holding that ADA does not require employer to assign fellow workers to assist plaintiff in performing his essential job functions because it involves a reallocation of plaintiff's job duties); *Stubbs v. Marc Ctr.*, 950 F. Supp. 889, 895 (C.D. Ill. 1997) (requested accommodation of temporarily shifting duties to coworkers is unreasonable); *Krennerich v. Inhabitants of Town of Bristol*, 943 F. Supp. 1345, 1351 (D. Me. 1996) ("an employer is not 'required to assign existing employees . . . to perform certain functions or duties of a disabled employee's job which the employee cannot perform by virtue of his disability.") (citing cases)).

a *prima facie* case of disability discrimination, and his final claim is dismissed as a matter of law.

IV.        <u>Conclusion</u>

Accordingly, it is hereby

**ORDERED** that Defendant's motion for summary judgment (Doc. 15) is **GRANTED**.

SIGNED at Houston, Texas, this 26th day of June, 2007.


MELINDA HARMON
UNITED STATES DISTRICT JUDGE